UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

Sheila Edmonson,  )
  )
    Plaintiff,  )
  )
v.  )  No. 14 CV 50135
  )  Magistrate Judge Iain D. Johnston
Carolyn W. Colvin, Acting  )
Commissioner of Social Security,  )
  )
    Defendant.  )

**MEMORANDUM OPINION AND ORDER**

Plaintiff Sheila Edmonson brings this action under 42 U.S.C. §405(g), challenging the denial of disability benefits. Before the Court are cross-motions for summary judgment. For the reasons stated below, the case is remanded.

**BACKGROUND**

On April 20, 2011, plaintiff filed her applications for disability insurance benefits. She was 45 years old. In November 2010, just a week after starting a new job at a construction company, she was injured in a car accident. A few days later, a doctor diagnosed her with a "traumatically-induced injury" to her cervical and lumbosacral spine. Dkt. #14 at 2. It is not clear whether the accident was sole the cause of her spinal-related problems, which are central to this appeal, or whether she also had pre-existing problems. Plaintiff testified that she was let go shortly after the accident, but did not blame this decision on her injury, stating instead that her employer "didn't like what I was doing" and was upset about an incident of losing paperwork. R.

1

22. In any event, both the parties and the administrative law judge ("ALJ") begin their fact summaries with the car accident, suggesting they view it as the key precipitating event.[1]

After the accident, plaintiff saw a series of doctors from November 2010 until February 2013. Because detailed chronologies are set forth in both the opinion and the parties' briefs, the Court will not re-summarize all the medical visits here. As summarized by the ALJ, plaintiff saw these medical providers, among others: (1) Dr. J. Kagan, referred to by the ALJ as "the treating orthopedist"; (2) Dr. Vo, described as "the treating spine physiatrist"; (3) Dr. K. Ramchandani, a consulting internist who examined plaintiff; (4) an unnamed ER physician; (5) Dr. Panepinto, a Disability Determination Services ("DDS") consultant; (6) Dr. Kinoshita, described as "the treating primary care physician"; (7) attending physician E. Okeson; (8) Dr. Christopher R. Pasquale; and (9) Dr. T. Arjmand, a DDS consultant.[2] R. 63-67. Three MRIs were performed on plaintiff's lumbar and cervical spine, and they showed (among other things) disc protrusions at L3-L4 with foraminal narrowing. Plaintiff also complained generally about pain in her arm, back, hip, and neck.

Not surprisingly, the parties emphasize those observations favoring their respective positions. *Cf.* Pl. Brief at 2 ("On objective testing, Dr. Kagan noted the existence of a positive straight leg raising test on the left side as well as a positive sciatic bow stretch test. Dr. Kagan advised Ms. Edmonson that, as a result of her lumbar radiculopathy, she could eventually develop an inability to control her bodily functions and could suffer from weakness in the lower extremities requiring surgery.") (citations omitted); *with* Gov. Brief at 3 ("During his exams of Plaintiff in February 2011, neurologist Dr. Sudderth observed normal motor strength, no atrophy,

---

[1] Because plaintiff's appeal focuses on her spinal problems, the Court will not summarize her problems from chronic obstructive pulmonary disease (she has been a smoker since age 15) or her gastrointestinal problems. It should also be noted that plaintiff was classified as obese, weighing 203 pounds with a BMI of 35. R. 67.

[2] There were other doctors as well, including Dr. Sudderth and Dr. Beretta.

normal gait and normal sensory exams."). As the repetition of the word "normal" suggests, the Government's theme is that plaintiff, at best, had sporadic and mild symptoms.

The medical record contains a plethora of seemingly different diagnoses and medical terminology offered by these doctors to describe what appear to be the same basic symptoms and problems. Here is a partial list culled from the record: spondylosis, sciatica, lumbago, degenerative disc disease, disc osteophyte complex, arthralgia, osteoarthritis, herniated disc with significant nerve root impingement, left ulnar nerve neuropathy, cervical myofascial pain, lumbar radiculitis, and scoliosis. As a result of these medical issues, plaintiff was prescribed various medications, including Neurontin, Flexeril, Norco, and a Medrol dosepack.

On March 13, 2013, a hearing was held before the ALJ. Plaintiff testified that, on a normal day, she "mostly [stays] in bed" (up to 8 hours) and does not do much else other than feeding herself and walking her dog. R. 22. She claimed to be able to walk 100 feet before needing to rest. She also asserted that she can stand, with the help of her cane, for about 20 minutes.

On April 26, 2013, the ALJ found plaintiff not disabled. Relevant to this case, the ALJ found that plaintiff had severe impairments of degenerative disc disease, radiculopathy, and left ulnar neuropathy. The ALJ found that plaintiff had the residual functional capacity ("RFC") to perform sedentary work with the two relevant limitations being that she use a cane and be given a "sit/stand option on an hourly basis." R. 62. The ALJ found that plaintiff's testimony was only partially credible, noting that (among other things) she had "not generally received the type of medical treatment one would expect for a totally disabled individual" and that she had taken a two-day trip to Florida. R. 69. The ALJ observed that plaintiff's treatments, such as steroid injections and medication, had led to improvement. As discussed below, the ALJ discounted the

3

opinions of two treating physicians. Relying on the vocational expert, the ALJ found that plaintiff could work as an assembler, sorter, or visual inspector.

## DISCUSSION

A reviewing court may enter judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). If supported by substantial evidence, the Commissioner's factual findings are conclusive. *Id.* Substantial evidence exists if there is enough evidence that would allow a reasonable mind to determine that the decision's conclusion is supportable. *Richardson v. Perales*, 402 U.S. 389, 399-401 (1971). Accordingly, the reviewing court cannot displace the decision by reconsidering facts or evidence, or by making independent credibility determinations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). However, the Seventh Circuit has emphasized that review is not merely a rubber stamp. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002) (a "mere scintilla" is not substantial evidence).

However, the Seventh Circuit has emphasized that review is not merely a rubber stamp. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). A reviewing court must conduct a critical review of the evidence before affirming the Commissioner's decision. *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008). Even when adequate record evidence exists to support the Commissioner's decision, the decision will not be affirmed if the Commissioner does not build an accurate and logical bridge from the evidence to the conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). Moreover, federal courts cannot build this logical bridge on behalf of the ALJ or Commissioner. *See Mason v. Colvin*, 2014 U.S. Dist. LEXIS 152938, at *19 (N.D. Ill. Oct. 29, 2014); *Jensen v. Colvin*, 2013 U.S. Dist. LEXIS 135452, at *33-34 (N.D. Ill. Sept. 23, 2014).

Plaintiff raises two arguments. First, she argues that the ALJ wrongly found that she did not meet Listing 1.04(A). Second, she argues that the ALJ failed to follow the treating physician rule. The Court finds that a remand is justified based on both arguments.

**I.       The Listing Argument.**

Listing 1.04(A) states:

> **1.04** *Disorders of the spine* (e.g. herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral facture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
>
> A.  Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)[.]

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04(A). The ALJ, who did not quote this provision, only provided the following one-sentence analysis:

> The claimant's back impairment did not meet or medically equal listing 1.04, as there is no evidence of spinal nerve compression with radiculopathy, arachnoiditis or spinal stenosis with pseudoclaudication, and inability to ambulate.

R. 62. In her opening brief, plaintiff argues this analysis is conclusory and requires a remand. She relies on *Kastner v. Astrue*, 697 F.3d 642, 647 (7th Cir. 2012) (remanding because the ALJ provided a "cursory" analysis of 1.04(A)). Contrary to the ALJ's assertion that there is "no evidence," plaintiff argues that there is such evidence, including MRIs documenting disc protrusions and foraminal narrowing. Although plaintiff argues that she meets all of the specific requirements of 1.04(A), her argument is itself fairly conclusory, consisting of a single sentence with multiple citations to the record but without any discussion of what those citations show.

In its response brief, the Government essentially concedes that the portion of the ALJ's analysis quoted above is insufficient. This is a wise decision, as the Seventh Circuit has

repeatedly found that similar perfunctory analyses required remand. *See, e.g., Minnick v. Colvin*, 775 F.3d 929, 935-36 (7th Cir. 2015) (ALJ's two-sentence discussion contained "no analysis whatsoever" and was "the very type of perfunctory analysis we have repeatedly found inadequate").[3] The Government instead argues that the ALJ provided a "fulsome discussion" of the listing evidence "later in her decision" when analyzing plaintiff's RFC. Dkt. # 17 at 8. The Government relies on *Rice v. Barnhart*, 384 F.3d 363, 370 n.5 (7th Cir. 2004), for the proposition that a reviewing court should "read the ALJ's decision as a whole [] because it would be a needless formality to have the ALJ repeat substantially similar factual analyses at both steps three and five." Alternatively, the Government argues that the decision can be affirmed under the harmless error doctrine.

To its credit, and unlike the ALJ, the Government undertakes a systematic analysis of Listing 1.04(A). It is not easy to neatly parse. To this Court's layperson "eyes," it appears to be a tangled bank, clothed with many interlocking medical concepts of many kinds, all fuzzily fused together in a complex manner. The Government helpfully tries to bring order to it by breaking the analysis into seven discrete requirements and then argues that plaintiff cannot meet several of them. The Government primarily focuses on the portion it labels as the "motor loss requirement" and argues that plaintiff cannot meet this requirement. The Government points to, among other things, a motor and sensory nerve conduction study showing normal functioning and to "several negative straight leg raise exams." Dkt. # 17 at 8-9 (citing to R. 350, 356, 371, 373, 375-76, 384, 401, 403, 544, 589, 699). This evidence, argues the Government, is "overwhelming," making it "eminently predictable" that plaintiff's listing argument will fail on remand. Dkt. #17 at 9.

---

[3] *See also Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006) (ALJ's "two-sentence discussion" of Listing 1.04(A) was "cursory"); *Taylor v. Barnhart*, 189 Fed. Appx. 557, 562 (7th Cir. 2006) (ALJ "never identified Listing 1.02A (joints) or 1.04A (spine) by name"); *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004) (two-sentence "perfunctory" listing analysis was inadequate).

In her reply brief, plaintiff complains that the above arguments violate the *Chenery* doctrine because the ALJ never relied on these grounds in the decision to deny benefits. Plaintiff also disputes the Government's claim that the evidence is overwhelming and states that the Government ignored evidence relating to the listing requirements, such as spasms in her cervical and lumbar spine, as noted by Dr. Sudderth; spasms and tenderness in her cervical and lumbar spine, as documented in chiropractic records; and sensory loss consisting of numbness of the left leg and left upper extremity.[4] Dkt. #18 at 1-2 (citing R. 372, 435, 483, 959).

This Court has considered this same back-and-forth sequence of arguments, brought by the same counsel, in two recent cases both addressing Listing 1.04(A). *See Tucker v. Colvin*, 2015 WL 6736700 (N.D. Ill. Nov. 4, 2015); *Swagger v. Colvin*, 2015 WL 6736683 (N.D. Ill. Nov. 4, 2015). In both cases, the Court reluctantly concluded that a remand was warranted under present Seventh Circuit case law, even though doubts existed about whether plaintiff could ultimately prevail. The same analysis and conclusion is applicable here. *See DR Dist., LLC v. 21 Century Smoking, Inc.*, 2015 U.S. Dist. LEXIS 167343, at *2 (N.D. Ill. Dec. 15, 2015) ("Consistency in judicial decision making is important. Indeed, the doctrine of *stare decisis* – a bedrock of the American judicial system – is based upon the important considerations of consistency and predictability in judicial decisions."); Strategic Plan for the Judiciary, p. 2 (September 2015) (identifying "legal predictability" as a core value).

As for the Government's argument that the ALJ implicitly analyzed the listing requirements, the Court is not persuaded. It is true that the ALJ engaged in a fairly lengthy recitation of the medical evidence, but this was mostly a long chronology of doctor visits with little commentary or analysis. Even when the ALJ offered some fleeting commentary, she never

---

[4] Plaintiff seems to assume that muscle spasms are equal to, or indicative of, motor loss; however, this connection has so far not been fully explained to the Court.

7

connected it back to the specific 1.04(A) requirements. Therefore, this Court cannot be sure whether the ALJ was aware of the specific sub-requirements when she made these observations. *See Minnick*, 775 F.3d at 936 (with no explicit analysis by the ALJ, a court cannot tell whether the ALJ "considered and dismissed" the pertinent evidence or whether the ALJ "completely failed to consider [it]").

As for the Government's harmless error argument, the Court agrees with the plaintiff that, under the particular facts of this case, these arguments violate the *Chenery* doctrine, which "forbids an agency's lawyers to defend the agency's decision on grounds that the agency itself had not embraced." *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010); *Kastner*, 697 F.3d at 649 (because "the ALJ never referenced motor loss as a basis for the determination at step 3," the Government's theory is "speculation barred by the *Chenery* doctrine"). This doctrine applies here because it is undisputed that most of the Government's arguments were never relied on by the ALJ.

In *Kastner* and related cases where the Seventh Circuit held that ALJ's 1.04 listing analysis was cursory, the Seventh Circuit did not discuss whether (and how) the harmless error doctrine should apply in light of *Chenery*. At the same time, in several of these cases, the Seventh Circuit did go on to discuss the evidence and made findings that the evidence was, for example, "significant," which could be viewed as a *de facto* harmless error analysis. *See, e.g.*, *Kastner*, 697 F.3d at 648 (7th Cir. 2012) ("Because the only evidence in the record demonstrated *significant limitations* in Kastner's range of motion, the ALJ's contrary conclusion is peculiar and unexplained.") (emphasis added); *Minnick*, 775 F.3d at 936 ("Minnick's degenerative disc disease *may well have satisfied* Listing 1.04A") (emphasis added). Accordingly, it is not clear to this Court how much leeway there is for application of the harmless error doctrine. In fact,

reconciling the harmless error doctrine with the principles of *Chenery*—particularly as interpreted by the Seventh Circuit—is a challenging task. This Court and apparently at least one other district court would greatly appreciate clarification and guidance from the Seventh Circuit in harmonizing these concepts. *See Swagger v. Colvin*, 2015 U.S. Dist. LEXIS 151502, *2 (N.D. Ill. Nov. 4, 2015); *Brandenburg v. Colvin*, 2015 U.S. Dist. LEXIS 104301, *24-26 (E.D. Wisc. Aug. 10, 2015); *Senn v. Astrue*, 2013 U.S. Dist. LEXIS 23794, *18-19 (E.D. Wisc. Feb. 2, 2013).

Regardless, the Court finds that reliance on the harmless error doctrine is not warranted here. As summarized above, the record in this case is lengthy with many observations from a series of doctors who often used different diagnostic labels to describe plaintiff's symptoms, making it difficult for this Court to know how these diagnoses relate back to the varying medical terms used in 1.04(A). Moreover, in the back and forth of the briefing process, the parties have not squarely responded in each instance to the observations relied on by the other side. In particular, the harmless error doctrine was first raised by the Government in its response brief; plaintiff then countered with citations to additional evidence in her reply brief. Therefore, the Government has not responded to this new evidence. Accordingly, if this Court were to rely on the harmless error doctrine, it would essentially have to review some of the evidence on a blank slate and construct a justification from the ground up. Under the facts presented here, this Court cannot engage in that process for the first time. *Mason*, 2014 U.S. Dist. LEXIS 152938 at *19 ("In the Seventh Circuit, an ALJ's decision can be supported by substantial evidence—or even a preponderance of the evidence, as it is here—but still will be overturned if the ALJ fails to build a 'logical bridge' from the evidence to her conclusion." (citing *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)). This is a task for the ALJ. The ALJ has the ability to call a medical expert and to also to request additional evidence if needed to clarify these issues. Additionally, given

9

that the Court would remand in any event based on the second argument below, the Court need not strain to apply the harmless error doctrine here, even though the Government has made a vigorous argument for its application.

## II. The Treating Physician Rule

Plaintiff next argues that the ALJ failed to follow the treating physician rule. The Court agrees. The treating physician rule is important in disability cases. This Court has repeatedly emphasized the importance of properly following the regulations when applying the treating source rule. *Duran v. Colvin*, 2015 U.S. Dist. LEXIS 101352, *26-28 (N.D. Ill. Aug. 4, 2015). It directs the ALJ to "consider *all*" of the following factors in weighing *any* medical opinion: (1) the length of treatment; (2) the nature and extent of the treatment relationship; (3) the supportability of the medical opinion; (4) the consistency of the opinion with the record as a whole; (5) the physician's degree of specialization; and (6) other factors supporting or contradicting the opinion. 20 C.F.R. § 404.1527(c). These "checklist factors" are designed to help the ALJ "decide how much weight to give to the treating physician's evidence." *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008). But within the weighing process, a treating physician opinion receives particular consideration. It is entitled to "controlling weight" if it is (i) "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and if it is (ii) "not inconsistent with the other substantial evidence in [the] case." *Id.* If the ALJ does not give the treating physician's opinion controlling weight, the ALJ cannot simply disregard it, but must proceed to the second step and determine what specific weight it should be given by using the checklist. *Moss v. Astrue*¸ 555 F.3d 556, 561 (7th Cir. 2009). In sum, the treating physician rule establishes a two-step process. For important reasons, these steps are separate and distinct.

*Taylor v. Colvin*, 2015 U.S. Dist. LEXIS 11300, *16-17 (N.D. Ill. Aug. 21, 2015). The ALJ's routine conflation of these steps is maddening.

Here, the ALJ did not comply with the above-described process. The ALJ discussed the medical opinion in three paragraphs; the first two were devoted to plaintiff's treating physicians and the last one to an agency doctor. R. 70. In the first paragraph, the ALJ summarized Dr. Pasquale's opinion—that plaintiff should be "limited [] to sit/stand every 30 minutes and [have] limited rotation of the neck"—and then stated:

> I cannot give much weight to Dr. Pasquale's opinion, as it is not supported by treatment records to such a severe extent or by diagnostic testing and it is not consistent with the medical evidence of record as a whole. For example, although Dr. Pasquale's treatment notes revealed a slow broad based gait, they also revealed negative straight leg raising test, full hip range of motion, good strength throughout the left leg, no reflex asymmetry or weakness in the leg (Exhibit 35F).

The second paragraph summarized Dr. Kinoshita's opinion that plaintiff should be "limited to sedentary work (no lifting more than 10 pounds at a time) with more than 50% reduction in postural activities and her ability to sit." The ALJ analyzed his opinion as follows:

> I find that certain aspects of Dr. Kinoshita's opinion are in fact consistent with the residual functional capacity determined in this decision. For example, Dr. Kinoshita's lifting restriction is consistent with the medical evidence of record; however, for the same reasons provided above, I am unable to give Dr. Kinoshita's opinion regarding the claimant's ability to perform postural movements and sit, as they are not supported by the medically acceptable clinical findings.

*Id.*[5] In the third paragraph, the ALJ explained why she gave "substantial weight" to an agency doctor, and also offered an additional point about Dr. Pasquale's opinion:

> I give substantial weight to the DDS assessment, as it is consistent with the medical evidence of record. I have added environmental restrictions to account for deficits from chronic obstructive pulmonary disease; however, I note that the claimant continues to smoke. Also, as to cane use, although Dr. Pasquale noted on February

---

[5] The Court has substituted the correct spelling of Dr. Kinoshita's name in this quotation. Additionally, the Court notes that the quote is accurate. A reader of the opinion can only assume what weight the ALJ gave to Dr. Kinoshita's opinion.

11

>   4, 2013 that the claimant was using a cane (Exhibit 40F), the record does not contain any prescription for a cane.

*Id.*[6]

The ALJ's analysis is insufficient in several ways. As for the first step of the treating physician rule, whether to give the treating physician's opinions controlling weight, the ALJ at least used some of the buzzwords of the two requirements, referring to "diagnostic testing" and "medically acceptable clinical findings," thus suggesting she was aware of these requirements, although she still did not use the precise phrase "controlling weight." Even so, it is obvious that she was not giving these opinions controlling weight. However, the ALJ did not venture beyond these boilerplate conclusions and offer a substantive explanation. There was only one sentence setting forth a specific argument based on specific evidence, but it only addressed Dr. Pasquale's opinion. The ALJ gave *no* specific reason for rejecting Dr. Kinoshita's opinion. It is true that the ALJ summarized the medical evidence in greater detail earlier in the opinion. But again, as with the listing analysis, this summary is not a substitute for analysis because it is merely a running narrative with no attempt made to marshal the evidence and apply it to the legal requirements. If the Court were to rely on this earlier discussion, it would have to guess at the precise rationale the ALJ was relying on. This is not what the treating physician rule envisions.

As for step two, the same basic infirmities are present. Specifically, there is no evidence that the ALJ applied—or even was aware of—the checklist. There are no *explicit* references, or even indirect allusions, to the factors. No finding was made, for example, about the length and

---

[6] The ALJ did not state who made the DDS assessment, nor provide a citation. In its brief, the Government states generally that the ALJ's RFC finding was supported by the medical opinions of two agency consultants, Dr. Panepinto and Dr. Arjmand. Dkt. #17 at 12. The Court notes that the ALJ's factual summary also refers to a consultative examination by Dr. K. Ramchandani. R. 64. So presumably the ALJ was relying on one or more of these three assessments. Not knowing which specific doctor made these findings is critical because, as noted above, one of the checklist factors is specialization. The referenced "DDS assessment" is essentially a best-case amalgam of the non-treating physicians.

nature of the treating relationships (first and second factors). Although the Court has not attempted to count up the precise number of visits plaintiff made to Dr. Kinoshita and Dr. Pasquale, the Court can take notice from the record that there were numerous visits and that they were obviously more than those to the DDS consultants, who either never saw plaintiff or saw her only once. The ALJ likewise did not discuss the specializations of these doctors (the fifth factor). In the narrative summary, the ALJ occasionally but haphazardly referred to a particular doctor's specialty, noting for example that Dr. Vo was a "spine physiatrist." R. 64. However, the ALJ never identified Dr. Pasquale's specialty. Based on a review of readily available government records, it appears that he, like Dr. Vo, is a physiatrist. www.idfpr.com. If true, then the ALJ's failure to include this fact raises the specter of cherry-picking.

More generally, the ALJ failed to explicitly analyze much of the evidence in stating that the treating physician's opinions were inconsistent with the record as a whole (fourth factor). The ALJ did offer one specific reason, which is the claim that Dr. Pasquale's treatment notes contained observations supposedly at odds with his opinion. It not clear whether these observations are medically inconsistent with the doctor's opinion that plaintiff would be limited in working due to her spinal-related pain. Also, although Dr. Pasquale did make the observations the ALJ referred to, he still continued to diagnose her with radicular leg pain and lumbar radiculopathy and still continued to prescribe Norco for pain. Dkt. #14 at 9. But the larger point is that the ALJ did not analyze the *other* evidence to determine whether Dr. Pasquale's conclusions were inconsistent. Consider the straight leg raising tests, for example. Although the ALJ noted that Dr. Pasquale concluded that plaintiff had a negative straight leg raising test on one visit, the ALJ did not take into account that Dr. Pasquale, at another visit, noted that the test was "equivocal" and that two other doctors (Dr. Kagan and Dr. Okeson) concluded that the test

was positive. R. 350, 356, 629, 641. As it did with the listing argument, the Government has attempted to fix these problems by offering a more detailed and more rigorous analysis. *See* Dkt. #18 at 14-19. However, this explanation again violates the *Chenery* doctrine and, for the same reasons stated above, this Court will not consider these arguments.[7]

In sum, this Court takes the view that an explicit analysis of the checklist is required under the treating physician's rule. *See Duran v. Colvin*, 2015 U.S. Dist. LEXIS 101352, *8-9 (N.D. Ill. Aug. 4, 2015). Here, the ALJ indisputably did not conduct an explicit analysis. But even if the Court allowed an implicit analysis, the ALJ still failed to properly apply the checklist for reasons stated above. *See Koelling v. Colvin,* 2015 U.S. Dist. LEXIS 14074, *28-29 (N.D. Ill. Oct. 16, 2015).

One concluding, but separate, point must be addressed. Although plaintiff did not directly challenge the ALJ's credibility findings, the Court notes that one of the reasons the ALJ gave for discounting plaintiff's credibility was that she took a trip to Florida. The ALJ stated the following:

> Despite the allegations of symptoms and limitations preventing all work, the record reflects that the claimant took a road trip to Florida in 2012 (Exhibit 38F/6) to visit her children and see her new grandchild. Although someone else drove, the trip took 2 days. Although a vacation and a disability are not necessarily mutually exclusive, the claimant's decision to go on a vacation requiring a long road trip tends to suggest that the alleged symptoms and limitations may have been overstated.

---

[7] One additional point regarding the ALJ's analysis. In the third paragraph, the ALJ stated that, although Dr. Pasquale observed that plaintiff was using a cane, "the record does not contain any prescription for a cane." R. 70. This statement carries a possible two-fold punch, suggesting both that plaintiff's problems were not serious and that she was pretending they were. But, as plaintiff points out (Dkt. #14 at 8), she had a prescription for a cane, and it came from Dr. Pasquale. *See* R. 543. At the hearing, the ALJ specifically asked whether she had a prescription, and she told the ALJ that she did and that she had sent a copy to the SSA. R. 32 ("You should have that, because I sent in a copy of the prescription."). The ALJ apparently did not find it. Thus, the ALJ appears to have been relying on a mistaken factual premise. This issue is potentially also relevant to the vocational expert's testimony which included questioning about whether plaintiff could work if she had to use the cane when standing on the job. *See* R. 47-48.

14

R. 69. The problem with this rationale is that the ALJ omitted the context. And context can be important, as it is here. The ALJ brought this issue up at the hearing and asked several questions about it. R. 33. Plaintiff explained that she only made this trip, which she did so reluctantly, because she had never seen two of her grandchildren (they were then three and four); that her children strongly encouraged her to come and paid for the trip; that she had not taken any other trip since the accident; and, most significantly, that the trip caused her to be hospitalized. Here is a key part of plaintiff's testimony: "It was very painful. On the way back from the trip, I felt so terrible [that] I ended up in the hospital for three days with low potassium. And my chest was hurting, and my back was hurting." R. 33. Because these countervailing facts are significant and undermine the impression created by the ALJ—that plaintiff was simply taking a routine vacation—the ALJ should have at least acknowledged them and offered some explanation. *See Pierce v. Colvin*, 739 F.3d 1046, 1050 (7th Cir. 2014) (remanding because ALJ's credibility determination "misstated some important evidence and misunderstood the import of other evidence").

In sum, based on these two arguments, the Court finds that a remand is warranted. As stated previously, the Court is not in any way indicating that plaintiff's case for being found disabled is a strong one. There are in fact a number of obstacles in her path, as the Government's brief has ably shown. One question, which the ALJ's decision touched upon briefly, is whether her problems were improving and thus were not permanent. In her brief, she stated that her injuries were traumatically induced by the car accident in 2010. If so, then it is possible that these problems will eventually abate. Given the time elapsed since the ALJ's decision, this question (as well as others) should come into sharper focus on remand.

## CONCLUSION

For these reasons, plaintiff's motion for summary judgment is granted, the government's motion is denied, and this case is remanded for further consideration.

Date: March 14, 2016  By: _____
Iain D. Johnston
United States Magistrate Judge